UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Matthew Adam HAAS,<br><br>                              Plaintiff,<br><br>v.<br><br>Andrew SAUL,<br><br>                              Defendant. | Case No.:  19-CV-02189-BGS<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF No. 17];**<br><br>**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [ECF No. 20]; AND**<br><br>**(3) REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |

## I.    INTRODUCTION

On November 18, 2019, Plaintiff Matthew Adam Haas ("Plaintiff") filed a Complaint seeking judicial review of the Commissioner of the Social Security Administration's ("Commissioner" or "Defendant") denial of his disability insurance

1

benefits under the Social Security Act.  (ECF No. 1.)[1]  On March 9, 2020, the Commissioner filed the Administrative Record.  (ECF No. 13.)  On May 15, 2020, Plaintiff filed a Motion for Summary Judgment seeking reversal of the final decision denying benefits and a remand for further administrative proceedings.  (ECF No. 17.)  Plaintiff argues the Administrative Law Judge ("ALJ") committed reversible error in rejecting the treating physician's opinion, rejecting Plaintiff's subjective symptom testimony, and failing to properly support his residual functional capacity determination with substantial evidence.  (*Id.*)  On June 12, 2020, the Commissioner filed his Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion.  (ECF No. 20.)  The Commissioner argues that the ALJ properly rejected the treating physician's opinion, properly rejected Plaintiff's subjective symptom testimony and properly supported his residual functional capacity determination with substantial evidence.  (*Id.*)  Plaintiff filed a Reply on June 25, 2020. (ECF No. 21.)

After careful consideration of the parties' arguments, the administrative record and the applicable law and for the reasons discussed below, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, the Commissioner's Cross Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, and the case is **REMANDED** for further proceedings.

## II.   PROCEDURAL HISTORY

Plaintiff filed a Title II application for a period of disability and disability insurance benefits on June 9, 2015, with an alleged onset date of March 23, 2015.  (AR 126, 133–34.)  Plaintiff's application was denied, (AR 146–49) and his subsequent request for reconsideration was also denied (AR 157–61).  At Plaintiff's request, a hearing before an ALJ was held on March 15, 2018 at which Plaintiff was represented by counsel and

---

[1] The Court cites the electronic CM/ECF pagination for citations to the parties' briefs.  All other citations are to the Administrative Record's pagination.

2

testified, along with a Medical and Vocational Expert.  (AR 63–124 [hearing transcript]; 162–65 [request for hearing].)  On August 24, 2018, the ALJ issued a decision finding that Plaintiff was not disabled and denied Plaintiff's application for benefits.  (AR 20–38.)  The Appeals Council denied review on March 8, 2019.  (AR 9–13.)

## III.   SUMMARY OF FIVE STEPS

The ALJ's decision explains and then goes through each potentially dispositive step of the familiar five-step evaluation process for determining whether an individual has established eligibility for disability benefits.[2]  (AR 23–37); *see Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724–25 (9th Cir. 2011); *see also* 20 C.F.R. § 404.1520.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period of his alleged onset date of March 23, 2015 through the date of last insured on September 30, 2017.  (AR 25–26.)  At step two, the ALJ found that Plaintiff had "generalized anxiety disorder with panic disorder [. . .], depression, not otherwise specified; [. . .] and history of alcohol dependence and tetrahydrocannabinol (THC) abuse [. . .] as medically determinable impairments that significantly limit the claimant's ability to perform basic work activities[.]"  (AR 26–28.)  At step three the ALJ considers whether the claimant's impairments "meet or equal" one or more of the specific impairments or combination of impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, the listings.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  Here, the ALJ found Plaintiff did not meet a listing.  (AR 28–30.)

---

[2] In order to qualify for disability benefits, an applicant must show that: (1) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  *Id.*  The claimant bears the burden of proving he is disabled.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  But, at step five, the Commissioner bears the burden of showing the claimant can do other kinds of work that exist in significant numbers in the national economy "taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id.*

If the claimant does not meet a listing, the ALJ "assess[es] and makes a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's residual functional capacity ("RFC") is the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). The RFC is used at the fourth and fifth steps to determine whether the claimant can do their past work (step four) or adjust to other available work (step five). *Id.*

Here, the ALJ found the following RFC for Plaintiff:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he is limited to understanding, remembering, and carrying out simple instructions for simple repetitive tasks with no interaction with the general public, occasional interaction with coworkers, no teamwork, and no production-based or quota-based performance.

(AR 31.)

As discussed more fully below, Plaintiff challenges the ALJ's RFC finding. Plaintiff argues that in arriving at this RFC, the ALJ erred in rejecting his treating physician's opinion that found he was more limited than this RFC, rejecting his testimony regarding the severity of his symptoms, and not fully including or rejecting the state consultant's opinion into his RFC determination. (ECF No. 17 at 10–14 ("[T]he ALJ erred by rejecting Dr. Watkins' opinion, because he failed to set forth and specific, legitimate reasons for discounting his opined limitations. Dr. Watkins' opinion is supported by his regular assessments of Plaintiff's functional status and mental status evaluation findings throughout the relevant period, and is consistent with the longitudinal treatment notes. His opinion was therefore entitled to deference"), 14–20 ("[T]he ALJ committed prejudicial error by failing to develop the record and obtain treatment notes for the portion of the relevant period form February 2016 through the Plaintiff's date last insured[.] [Further,]

the ALJ failed to identify any clear and convincing reason for rejecting Plaintiff's subjective complaints [and] rejected Plaintiff's subjective complaints based upon isolated pieces of the records, and failed to consider the context of Plaintiff's treatment records as a whole"), 20–21 ("[T]he ALJ failed to support [his residual functional capacity determination] with substantial evidence in the record, and failed to explain why evidence of greater limitations was rejected").)  Defendant maintains that the ALJ properly weighed the treating physician's opinion, while providing specific and legitimate reasons supported by substantial evidence in discounting additional limitations; that the ALJ properly found that the record did not adequately support Plaintiff's allegations of disabling limitations; and that the ALJ properly accounted for Dr. Thibodeau's opinion in Plaintiff's RFC.  (*See* ECF No. 20 at 3–6, 7–11, 12–13.)

At step four, the ALJ found that Plaintiff could not do his past relevant work as a payroll bill specialist.  (AR 36.)  At step five, the ALJ considers whether the claimant can do other work, considering the claimant's age, education, work experience, and the limitations in the RFC.  20 C.F.R. § 404.1520(a)(4)(v); *see also* (AR 37).  If the claimant can do other available work, then the claimant is found not disabled; but if the claimant cannot do any other available work, then the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(v), 404.1520(g); *see also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  Here, the ALJ heard and relied on a vocational expert's testimony that opined that work existed in significant numbers in the national economy for a person of Plaintiff's age, education, work experience and with the RFC found by the ALJ.  (AR 38, 110–111, 113–18.)

## IV.   SCOPE OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful claimants to seek judicial review of a final agency decision.  42 U.S.C. § 405(g).  This Court has jurisdiction to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  *See id.*; 20 C.F.R. § 404.900(a)(5).  The matter may also be remanded to the Social Security Administration for further proceedings.  42 U.S.C. § 405(g).

If the Court determines that the ALJ's findings are not supported by substantial evidence or are based on legal error, the Court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). The Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). The Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014). "When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

## V.   DISCUSSION

Plaintiff argues the ALJ erred in three respects: (1) rejecting the treating physician's opinion (ECF No. 17 at 10–14); (2) failing to properly evaluate Plaintiff's subjective complaints (*Id.* at 14–20); and (3) failing to properly support his residual functional capacity determination with substantial evidence (*Id.* at 20–21).

### A. Rejection of the Treating Physician's Opinion

The ALJ rejected Plaintiff's treating physician's opinion, that of Dr. Watkins. (*See* AR 34.) The ALJ acknowledged that Dr. Watkins was Plaintiff's treating psychiatrist and the Commissioner does not suggest otherwise in his briefing.[3] (*See id.*; *see also* AR 536.) The Court first sets out the requirements for rejecting the opinion of a treating physician and then considers whether the ALJ's decision met the standard as to Dr. Watkins' opinion. ///

---

[3] There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995)). Generally, the weight to be given descends, with the greatest weight given to treating physicians and the least to non-examining physicians. *Id.*

### 1. **Applicable Standard**

Treating physician opinions are afforded greater weight "because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to substantial weight."); *see also Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988) ("We have made it clear that the medical opinions of a claimant's treating physicians are entitled to special weight"). "The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). "When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* (citing § 404.1527(c)(2)–(6)). Failing to consider the factors for weighing the opinion "alone constitutes reversible legal error." *Id.* at 676.

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the court's] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

thereof, and making findings." *Trevizo*, 871 F.3d at 675; *Magallanes*, 881 F.2d at 751 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

"The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). Further, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

In considering whether an ALJ has properly rejected a doctor's opinion, the court must rely only on the ALJ's stated bases for rejecting the claimant's disability claims. *Trevizo*, 871 F.3d at 677 n.4 ("Because the ALJ did not provide these explanations herself as a reason to reject [the treating doctor's opinion], the district court erred in looking to the remainder of the record to support the ALJ's decision, and we cannot affirm on those grounds."); *Garrison*, 759 F.3d at 1009 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely"); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

### 2. ALJ's Rejection of Dr. Watkins' Opinion

As for Dr. Watkins' opinion, the ALJ gave his opinion "very little weight." (AR 34.) The ALJ indicated in his decision that Dr. Watkins was Plaintiff's treating psychiatrist and that Dr. Watkins provided an opinion letter on October 16, 2015. (*Id.*) (citing AR 536). In this opinion letter, Dr. Watkins' opined:

> I am the current treating Psychiatrist for patient Matthew Haas[.] This patient has been under my care since 6/9/15 but he has been treated by various providers in my clinic beginning in September of 2013. Matthew has requested that I write this letter on his behalf. The patient currently suffers from Generalized Anxiety Disorder and Panic Disorder with extreme

8

Agoraphobia. The patient is currently involved with therapy and is compliant with his medications, but he continues to suffer greatly.

To be frank, Matthew has one of the most extreme cases of anxiety that I have come across to date. I have been working diligently with Matthew to try and figure out combinations of medications that can be helpful to him. We have found some that help, but the patient remains extremely anxious and his Agoraphobia remains as severe as when I met him.

(AR 536.)  The ALJ's decision first points out that Dr. Watkins' opinion was conclusive without evidence of a function-by-function examination and the issue of whether a claimant is disabled or unable to work is an administrative finding left for the commissioner to determine under 20 C.F.R. 404.1527(d) and 416.927(d).  (AR 34.)  The ALJ indicated that Dr. Watkins' relationship and treatment history was short and infrequent.  (*Id.*) (citing AR 536).  Further, the ALJ stated that it was unclear how long Dr. Watkins had been practicing to be able to make such an extreme statement that Plaintiff's condition is "one of the most extreme cases" he had ever seen.  (*Id.*)

The ALJ also indicated that Dr. Watkins' opinion was "not supported by medically acceptable clinical and laboratory diagnostic techniques and other substantial evidence in this matter, including Dr. Watkins' contemporaneous treatment records."  (*Id.*) (citing AR 385–533).  The decision looked at Dr. Watkins' June 9, 2015 treatment notes, where the ALJ noted that Dr. Watkins found that Plaintiff's impairments only moderately interfered with his functioning and that Plaintiff's mental status examination was unremarkable despite appearing fidgety and having an anxious mood.  (*Id.*) (citing AR 337–38).  The ALJ stated that "Dr. Watkins merely recommended a follow up visit in two months without referring the [Plaintiff] to more urgent services, which would be more appropriate if his anxiety, panic attacks, and agoraphobia symptoms were as 'extreme' as he described it."  (AR 34–35) (citing AR 337–38).  The decision then cited to Dr. Pratt's November 5, 2015 treatment notes, finding that Plaintiff had only mild symptoms despite Plaintiff's unstable condition and his poor compliance with the recommended treatment.  (AR 35) (citing AR 552).

The Court addresses each reason in turn.

### 3.  Analysis of ALJ's Rejection of Dr. Watkins' Opinion

In making his RFC determination, the ALJ considered one other opinion that contradicted Dr. Watkins' opinion. (*See* AR 34.)  State agency consultant Dr. Thibodeau provided his opinion as to Plaintiff's limitations, wherein he found that Plaintiff had some limitations, but did not find them to be as limiting as Dr. Watkins did. (*See id.*)  As part of his assessment, Dr. Thibodeau opined that Plaintiff still had the ability to "carry out very short and simple instructions" despite his impairments and that Plaintiff's "ability to interact with the public, coworkers, and supervisors was moderately limited." (*Id.*) Although Plaintiff does not ask the Court to apply the clear and convincing standard that applies to uncontradicted opinions, the Court finds that Dr. Watkins' opinion is contradicted.  Thus, the Court treats Dr. Watkins' opinion as being contradicted by the state agency consultant Dr. Thibodeau and considers whether the ALJ's decision met the standard, outlined above, for rejecting a treating physician's contradicted opinion. *See Trevizo*, 871 F.3d at 676 (finding the ALJ failed to expressly find a treating physician opinion contradicted the rejected opinion, but inferring from the record that it was and finding the decision failed to meet the standard for rejection of a contradicted treating physician opinion).

Further, the Court finds the reasons provided by the ALJ to discount the opinions are within the recommended factors described in *Trevizo*. *See* 871 F.3d at 675. Specifically, 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."); (c)(2)(i) (Length of the treatment relationship and the frequency of examination); (c)(2)(ii) (Nature and extent of the treatment relationship); (c)(3) (Supportability); (c)(4) (Consistency); (c)(6) (Other factors which tend to support or contradict the medical opinion).  The issue presents not whether the ALJ relied on

erroneous factors to discredit Dr. Watkins' opinion, but whether he made adequate findings supported by substantial evidence.  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Trevizo*, 871 F.3d at 675 (citing *Magallanes*, 881 F.2d at 751).

### a.   Conclusive Opinion

In giving Dr. Watkins' October 16, 2015 letter "very little weight," the ALJ found that "Dr. Watkins' opinion is a conclusive statement without evidence of a function-by-function examination."  (AR 34.)

As for supporting a medical opinion, "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."  20 C.F.R. § 404.1527(c)(3).  A conclusive opinion not based on evidence is not entitled to any weight.  *See Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."); *see also Farris v. Comm'r of Soc. Sec.*, No. 1:11-CV-258, 2012 WL 1552634, at *8 (S.D. Ohio Apr. 2012) ("Dr. Swope's opinion was not based on this evidence and the ALJ was not required to give his opinion any greater weight due to its lack of supporting evidence."), *report and recommendation adopted sub nom. Farris v. Comm'n of Soc. Sec.*, No. 1:11-CV-258, 2012 WL 1884232 (S.D. Ohio May 2012).

The opinion that the ALJ referred to as being a "conclusive statement without evidence of a function-by-function examination" was Dr. Watkins' October 16, 2015 opinion letter.  (*See* AR 34.)  In this letter, Dr. Watkins opined that Plaintiff continued to suffer greatly despite his compliance with his medications.  (*See* AR 536.)  Dr. Watkins then stated that "[t]o be frank, [Plaintiff] has one of the most extreme cases of anxiety that

I have come across to date." (*Id.*)  Dr. Watkins then asserted that Plaintiff "remains extremely anxious and his Agoraphobia remains as severe as when I met him." (*Id.*)

What is lacking is any support from objective criteria and documentation for this opinion.  In his opinion letter, Dr. Watkins' only noted that he has been treating the Plaintiff since June 2015, that Plaintiff suffers from a "Generalized Anxiety Disorder [as well as a] Panic Disorder with extreme Agoraphobia," and that Plaintiff "continues to suffer greatly" despite being involved with therapy and compliant with medications. (*See* AR 536.)  Yet, Dr. Watkins did not support his opinion with any relevant evidence, particularly lacking any detailed objective criteria and documentation regarding his conclusive findings.  Dr. Watkins indicated that despite working with Plaintiff to find the right medication combination, "[Plaintiff] has one of the most extreme cases of anxiety that [he has came] across to date." (*Id.*)  However, without any reference to how many patients he has seen prior to Plaintiff, Dr. Watkins' opinion lacks any foundation. Thus, the Court finds that Dr. Watkins' brief, two paragraph letter in itself is conclusive, and the ALJ properly discounted it on this basis.  *See Buxton,* 246 F.3d at 773.

### b.  Function-by-Function Examination

Failing to provide a function-by-function analysis is not a sufficient reason for rejecting a medical source's opinion, especially from a treating physician.  *See Herlinda C. v. Saul*, No. CV 19-2730-AGR, 2020 WL 6287716, at *4 (C.D. Cal. Oct. 2020) (citing *Phillips v. Colvin*, No. EDCV 13-538-CW, 2014 WL 1246342, at *4 (C.D. Cal. Mar. 2014) ("[The treating physician's] failure to provide a function-by-function assessment of Plaintiff's limitations may not be a valid reason for discounting his opinion.")); *see also Farris*, 2012 WL 1552634, at *13 ("There is no requirement [. . .] that a medical source opinion must provide a 'function by function' analysis, nor does the lack of such an analysis provide a proper basis for an opinion's outright rejection."); *Garrison v. Astrue*, No. 10-CV-793-JCC-BAT, 2011 WL 813832, at *3 (W.D. Wash. Jan. 2011) ("It was also error to reject the doctor's opinion because it lacked a 'function-by-function' assessment. It is the ALJ, not a doctor, who is required in assessing a claimant's RFC to identify the claimant's

limitations on a function-by-function basis[.]"), *report and recommendation adopted*, No. C10-0793, 2011 WL 806548 (W.D. Wash. Feb. 2011).

However, the ALJ rejecting a treating physician's report for failing to provide a "function-by-function" analysis concerns only the form of the report, as opposed to its substance. If the ALJ still thoroughly considers the evidence as a whole and made his findings based on that analysis, as opposed to rejecting the opinion solely on a lack of a "function-by-function" analysis, then the ALJ's findings can still be upheld. *See Rivers v. Astrue*, No. 1:08–cv–1824, 2009 WL 1160259, at *15–*16 (N.D. Ill. Apr. 2009) (holding that medical sources are not required to provide detailed function-by-function RFC, but still upheld the ALJ's decision because "the ALJ thoroughly considered both medical and non-medical evidence.").

As to this reason, the issue is whether the ALJ's decision in giving Dr. Watkins' opinion very little weight was based solely on Dr. Watkins October 16, 2015 opinion letter lacking a function-by-function analysis, or whether the ALJ based that decision on a thorough review of the records. Looking at the reasons provided, the ALJ did not give Dr. Watkins' opinion very little weight solely due to the lack of a function-by-function analysis. The ALJ decision also indicated that he based his decision on his review of the medical records as a whole. The ALJ reviewed the record as it related to Dr. Watkins' treatment relationship as well as to his finding that Dr. Watkins' opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques. (*See* AR 34.) Therefore, the Court finds that that the ALJ did not err as to this basis.

### c.   Short and Infrequent Relationship

Next, the ALJ found that "Dr. Watkins' relationship and treatment history was short and infrequent" despite Dr. Watkins' "additional education and training to opine about the [Plaintiff's] capacity due to his mental health limitations." (AR 34.)

Plaintiff argues that Dr. Watkins' opinion is still entitled to deference even if he did not have a lengthy treatment relationship. (ECF No. 17 at 12). Plaintiff claims that Dr. Watkins' treatment relationship is just a factor to consider, which weighs in

Dr. Watkins' favor since the only other opinions in the record are from non-treating, non-examining sources.  (*See id.*)  Defendant countered, stating that the ALJ did not only rely on the brevity of the treatment relationship, but also relied on the minimal nature of Dr. Watkins' treatment recommendations.  (ECF No. 20 at 7.)

Generally, "[a]n ALJ may properly consider the length of treatment and the frequency of examinations in assessing what weight to give a treating source's opinion." *Rodriguez v. Berryhill*, No. 1:15-CV-01780-SKO, 2017 WL 896304, at *10 (E.D. Cal. Mar. 2017) (citing 20 C.F.R. § 404.1527(c)(2)(i); *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1038–39 (9th Cir. 2003); *Edlund v. Massanari*, 253 F.3d 1152, 1154, 1157 (9th Cir. 2001)).  In assessing the weight of Dr. Watkins' opinion, the ALJ properly looked at the length of Dr. Watkins' treatment history and the duration of the treatment visits.  Thus, to the extent that the ALJ rejected Dr. Watkins' opinion based on the limited treatment relationship, the Court finds that the this constitutes a legitimate reason for rejecting Dr. Watkins' opinion.

Since the ALJ rejected Dr. Watkins' opinion for being short and infrequent, the ALJ must support his "specific and legitimate" reason with substantial evidence.  *See Garrison*, 759 F.3d at 1012.  Here, the ALJ properly relied up Dr. Watkins' relationship and treatment history with the Plaintiff.  *See* 20 C.F.R. § 404.1527(c)(2)(i) (Length of the treatment relationship and the frequency of examination); (c)(2)(ii) (Nature and extent of the treatment relationship).  By the time he wrote his October opinion letter, Dr. Watkins had only saw Plaintiff three times.  (*See* AR 335–38, 539–41, 544–46.)  The record indicates that these three visits were the only times that Dr. Watkins saw the Plaintiff during the time between the alleged onset date and the date of last insured.

All of Dr. Watkins' three consultations with the Plaintiff were completed within three months.  The record indicates that Dr. Watkins' first visit with Plaintiff was on June 9, 2015.  (AR 335, 536.)  Dr. Watkins then saw the Plaintiff on July 29, 2015 and September 9, 2015, before writing his opinion letter on October 16, 2015.  (AR 536, 539, 544.)  Yet, Plaintiff still requested an opinion letter from Dr. Watkins, despite Dr. Watkins limited

treatment relationship and having "been treated by various providers [since] September of 2013." (AR 536.) Of importance, Dr. Watkins' three consultations with the Plaintiff were for only 25 minutes each. (*See* AR 335 ["25 minutes"]; 539 ["25 minutes"]; 544 ["25 minutes"].)

Accordingly, Dr. Watkins' total face time spent with the Plaintiff, as indicated by the record, was 75 minutes. Thus, the Court finds that the ALJ properly relied on Dr. Watkins' limited treatment relationship to discount his opinion, which constitutes a legitimate reason and is supported by substantial evidence.

### d. Inconsistencies

In giving "very little weight" to Dr. Watkins' opinion, the ALJ also reasoned that the opinion "is not supported by medically acceptable clinical and laboratory diagnostic techniques and other substantial evidence in this matter, including Dr. Watkins' contemporaneous treatment records." (AR 34.) The ALJ cited to Dr. Watkins' June 9, 2015 Progress Notes and Dr. Pratt's November 5, 2015 Progress Notes in support. (*Id.*) (citing AR 337–38, 552). As for Dr. Watkins' June 9, 2015 Progress Notes, the ALJ reasoned:

> Dr. Watkins found that the claimant's impairments only moderately interfered with his social, occupational, or school functioning, and his mental status examination, besides appearing fidgety and having an anxious mood, was unremarkable. (Exhibit 1F/9–10) In addition, Dr. Watkins merely recommended a follow up visit in two months without referring the claimant to more urgent services, which would be more appropriate if his anxiety, panic attacks, and agoraphobia symptoms were as "extreme" as he described it. (Exhibit 1F/9–10)

(AR 34–35.) The ALJ also indicated that "[Dr. Pratt,] who assessed the [Plaintiff] on November 5, 2015, shortly after Dr. Watkins' statement, opined that the [Plaintiff] despite his unstable condition, had mild symptoms, and that the [Plaintiff's] compliance with recommended treatment was poor. (Exhibit 5F/16)." (AR 35.)

Plaintiff argues that the ALJ selectively discussed Dr. Watkins' opinion along with the contemporaneous treatment records, stating that the ALJ failed to consider the

record as a whole.  (ECF No. 17 at 12; *see also* ECF No. 21 at 2–3.)  Plaintiff states that even though he had "moderate difficulty in social, occupational, or school functioning" on June 9, 2015, his symptoms continued to get worse as time went on, showing that Plaintiff's symptoms were "severe" and "worsening."  (ECF No. 17 at 13–14.)  Plaintiff states that the ALJ's references to "mild" or "moderate" symptoms are isolated throughout the record and does not represent Plaintiff's functioning.  (*Id.* at 14.)

Defendant contends that the ALJ reasonably found that the weight of the evidence did not warrant additional restrictions and that the ALJ interpreted the evidence favorably to the Plaintiff.  (ECF No. 20 at 4–6.)  Further, Defendant states that the Plaintiff, not the ALJ, cherry picks the medical evidence by citing to two isolated instances of Plaintiff's Global Assessment of Functioning (GAF)[4] scores between 40–51, despite the majority of his GAF scores were in the 51–60 moderate range and ignored the instances of GAF scores of 61–70 that included mild symptoms.[5]  (*Id.* at 7.)

---

[4] The ALJ's decision provided an explanation GAF scores, indicating that it "is a numeric scale used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of an individual. Scores are a single global impression that can range from 100 (extremely high functioning) to l (severely impaired). They are subject to great variability from one practitioner to the next and from day-to-day because they only represent a snapshot of the individual on the day of the assessment. Moreover, the score is 'global' and considers several factors such as grief or homelessness; consequently, less definitive with respect to particular aspects of workplace functioning. The GAF scale was included in Diagnostic and Statistical Manual of Mental Disorders (DSM), Fourth Edition (2000), but removed in the DSM, Fifth Edition (2013) and the WHO Disability Assessment Schedule was added."  (AR 35 n.2.)

[5] The ALJ provides an explanation of the different GAF score ranges: "A score of 71–80 represents transient and expectable reactions to psychosocial stressors such as difficulty concentrating after a family argument and not more than a slight impairment in social occupation, or school functioning, which indicated that his depression and anxious symptoms did not interfere with his functioning more than in a slight manner. A score of 51–60 represents moderate symptoms such as flat affect, circumstantial speech, and occasional panic attacks, or any moderate difficulty in social, occupational, or school functioning such as few friends and conflicts with peers or coworkers, which indicated that his depressive and anxious symptoms had some effect on his functioning. A score of 41–50 represents serious symptoms such as suicidal ideation, severe obsessional rituals, or frequent shoplifting, or any serious impairment in social, occupational, or school functioning such as no friends or unable to keep a job, which indicated that his depressive and anxious symptoms did affect his functioning significantly."  (AR 35) (emphasis omitted).

"[T]he more consistent a medical opinion is with the record as a whole, the more weight [the Agency] will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). When there is "[a] conflict between a treating physician's medical opinion and his own notes," an ALJ has a "specific and legitimate reason for rejecting it." *See Ford*, 950 F.3d at 1154 (noting that because it is a clear and convincing reason it is also a specific and legitimate reasons), 1155 ("An ALJ is not required to take medical opinions at face value but may take into account the quality of the explanation when determining how much weight to give a medical opinion.") (citing *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Bayliss*, 427 F.3d at 1216).

The ALJ reasonably found that Dr. Watkins' October opinion letter was inconsistent with his own assessment that was detailed in his June 9, 2015 Progress Notes. In his October opinion letter, Dr. Watkins compared the severity of Plaintiff's Agoraphobia as being just as severe as when he first treated him. (*See* AR 536.) The record indicates that the first time that Dr. Watkins treated Plaintiff was on June 9, 2015, where he spent 25 minutes face to face with the Plaintiff. (AR 336–37.) Given that Dr. Watkins himself referred back to this consultation in support of his conclusive opinion, the Court gives more credence to that June 9, 2015 assessment than his October opinion letter. In this assessment, Dr. Watkins diagnosed the Plaintiff with a General Anxiety Disorder and a Panic Disorder with Agoraphobia. (*Id.*) Dr. Watkins then assigned a GAF score of 60 with moderate difficulty in social, occupational or school functioning and advised Plaintiff to follow up in two months for medication management. (*Id.*)

Applying Dr. Watkins' analysis, Plaintiff's symptoms in June 2015 were considered moderate, not extreme. (*See* AR 336–37.) In fact, Dr. Watkins assigned Plaintiff a GAF score of 60–51 in his June 2015 Progress Notes, which represents only moderate symptoms. (*See* AR 35); *see also Graham v. Astrue*, 385 Fed. App'x. 704, 706 (9th Cir. 2010) ("[Claimant] correctly points out that the GAF scores are not dispositive [. . .] [b]ut the GAF scores are nonetheless relevant."). However, Dr. Watkins' opinion must also be read in context with the overall diagnostic picture that he draws from. *See Robbins*,

466 F.3d at 882 ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.").

Looking at the record as whole, the Court finds that the ALJ's finding is supported by substantial evidence. For example, on May 20, 2015, Dr. Gray assigned a GAF score of 60 with moderate to severe symptoms. (AR 334.) Dr. Watkins' June 9, 2015 Progress Notes indicated that he gave Plaintiff a GAF score of 60 with moderate difficulty in social, occupational, or school functioning due to anxiety. (AR 337.) Then on July 29, 2015, Dr. Watkins gave a GAF score of 50 with moderate to great difficulty in social, occupational, or school functioning due to anxiety. (AR 540–41.) MFT Michelle Garber Fogle's August 19, 2015 Progress Notes indicated that Plaintiff's overall impairment was moderate and had severe symptoms, with a GAF score of 51–41. (AR 542–43.) Dr. Watkins' September 9, 2015 Progress Notes assessed that Plaintiff remained "very anxious at this time and is isolating himself as a result of his agoraphobia." (AR 545.) Dr. Watkins noted that Plaintiff's compliance with treatment was "good" and Plaintiff's condition is unchanged and persistent. (AR 546.) However, Dr. Watkins still gave a GAF score of 60–51 with moderate difficulty in social, occupational, or school functioning. (*Id.*)

MFT Fogle's October 7, 2015 Progress Notes indicated that even though Plaintiff's symptoms were listed as "severe and intolerable," she still assigned a GAF score of 60–51 with moderate symptoms and moderate difficulty in social, occupational, or school functioning. (AR 547–48.) Then on October 20, 2015, MFT Fogle again found that Plaintiff had moderate symptoms and assigned a GAF score of 60–51 with moderate difficulty in social, occupational, or school functioning. (AR 549–50.) MFT Fogle's November 16, 2015 Progress Notes indicated that Plaintiff's symptoms were "severe," yet still assigned a GAF score of 60–51 with moderate symptoms and moderate difficulty in social, occupational, or school functioning. (AR 553–54.) Dr. Joseph Schuermeyer's November 23, 2015 Progress Notes indicated that Plaintiff's "[c]ondition is worsening" and that he "continues to have intense anxiety surrounding leaving his room." (AR 556.)

However, Dr. Schuermeyer still gave a GAF score of 60–51 with moderate symptoms and moderate difficulty in social, occupational, or school functioning.  (AR 557.)

MFT Fogle's December 12, 2015 Progress Notes indicated that Plaintiff had "mild and moderate" symptoms and gave a GAF score of 70–61 with mild symptoms.  (AR 558–59.)  MFT Fogle noted that Plaintiff had some difficulty in social, occupational, or school functioning; had some meaningful social relationships; and "[g]enerally functioning pretty well."  (*Id.*)  Then on December 16, 2015, MFT Fogle's Progress Notes listed Plaintiff's symptoms as "moderate and frequently intolerable" and assigned a GAF score of 60–51 with moderate symptoms.  (AR 560.)  Further, in his December 29, 2015 Progress Notes, Dr. Schuermeyer noted that Plaintiff's condition is "unchanged" and gave a GAF score of 51–41 with serious symptoms and serious difficulty in social, occupational, or school functioning.  (AR 563.)  MFT Fogle's January 13, 2016 Progress Notes indicated that moderate symptoms and assigned a GAF score of 60–51.  (AR 565.)

As indicated above, the record supports the ALJ's decision to reject Dr. Watkins' opinion for being inconsistent with the medically acceptable clinical and laboratory diagnostic techniques and other substantial evidence.  The record shows that a majority of the other physicians that treated the Plaintiff indicated that Plaintiff suffered from moderate symptoms along with GAF scores mostly ranging between 51–60, during the relevant time period.  Not only is Dr. Watkins' opinion inconsistent with the record, he contradicted himself in his June 9, 2015 treatment notes regarding the seriousness of the Plaintiff's impairments.  Further, the ALJ properly considered the opinion of another psychiatrist, Dr. Pratt, in stating that it contradicted Dr. Watkins' October 2015 opinion, wherein Dr. Pratt described Plaintiff's symptoms as being mild along with poor compliance with his recommended treatment.  (AR 35; *see also* AR 552.)  Thus, the Court finds that the ALJ has provided specific and legitimate reasons in rejecting Dr. Watkins' October opinion letter as not being supported by medically acceptable clinical and laboratory diagnostic techniques, which is supported by substantial evidence of the record.

///

### e.   Conservative Treatment

In rejecting Dr. Watkins' October opinion letter, the ALJ questioned Plaintiff's conservative treatment in comparison to the severe symptoms that were claimed to have been caused by his impairments.  The ALJ stated that "Dr. Watkins merely recommended a follow up visit in two months without referring the claimant to more urgent services, which would be more appropriate if his anxiety, panic attacks, and agoraphobia symptoms were as "extreme" as he described it."  (AR 34–35.)

Plaintiff states that the treatment records and record as a whole are consistent with Dr. Watkins' opinion of disabling anxiety and agoraphobia.  (ECF No. 17 at 14.) Plaintiff states that he was prescribed many psychotropic medications and attended therapy regularly, while the ALJ failed to explain what other treatments were available and appropriate for the Plaintiff.  (ECF No. 21 at 4–5.)

Defendant argues that the ALJ properly found that Plaintiff's level of treatment undermined limitations beyond a more restrictive RFC and that Dr. Watkins' treatment recommendations were not consistent with his description of extreme anxiety, panic attacks, and agoraphobia.  (ECF No. 20 at 5–6.)

When supported by substantial evidence, an ALJ may properly discount a physician's opinion that is inconsistent with the conservative nature of the claimant's treatment.  *See, e.g., Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  The Ninth Circuit and other courts have recognized that within the context of mental health conditions, the prescription of psychiatric medications is not indicative of conservative treatment.  *E.g.*, *Drawn v. Berryhill*, 728 Fed. App'x. 637, 642 (9th Cir. 2018) (holding that the ALJ erred in finding claimant's treatment to be conservative "given that she was prescribed a number of psychiatric medications").  Even when the record does not indicate any history of hospitalization, "Courts have concluded that it is error to describe as conservative a course of treatment including psychiatric drugs[.]"  *Green v. Berryhill*, No. 217CV01339APGNJK, 2018 WL 4291960, at *6 (D. Nev. Aug. 2018), *report and recommendation adopted*, No. 217CV01339APGNJK, 2018 WL 4286165 (D. Nev. 2018).

20

Although the ALJ infers that Plaintiff's treatment is conservative, this inference is not supported by substantial evidence in the record.  The record reveals that Plaintiff's treatment was anything but conservative.  In addition to scheduling follow-up visits, the record indicates that Dr. Watkins' prescribed and continued medications, while also referring him to therapy.  (*See* AR 338, 541, 546.)  The ALJ failed to look at the other treatment that Plaintiff received from Dr. Watkins during these visits.  Looking at the medical records as a whole, Plaintiff had been prescribed a variety of psychiatric medications throughout the relevant period.  (AR 330–32, 336–38, 539–41, 544–46, 551–52, 555–57, 562–63.)  Additionally, the medical records indicate that Plaintiff attended psychotherapy for eight months in 2015 and part of 2016 to assist in treating his impairments.  (AR 334, 542,547, 549, 553, 558, 560, 564.)  The Court finds this is not a conservative course of treatment.

Further, the ALJ does not identify in the record what more urgent services would be required if Plaintiff's anxiety and panic attacks were as "extreme" as Dr. Watkins' described.  An ALJ is entitled to draw inferences, however, they must flow from the evidence.  *See Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir.1982) ("In reaching his findings, the law judge is entitled to draw inferences logically flowing from the evidence.").  Here, the ALJ's decision inferred that Dr. Watkins' treatment was conservative in nature due to scheduling a follow up visit in two months without referring him to more urgent services.  (AR 34–35.)  However, the ALJ failed to draw his inference from evidence in the record and appeared to apply his own common sense and experience in making this finding.  (*See* AR 34–35.)  As indicated above, the ALJ's inference that Plaintiff was only prescribed conservative treatment lacks substantial evidence and was not based on the Plaintiff's medical records.  Notwithstanding, the ALJ did not identify what more urgent services would be appropriate for the Plaintiff.  Thus, the Court finds that the ALJ erred in discounting Dr. Watkins' opinion as to this basis.

///

///

### f.   Duty to Address Conflicting Evidence

Plaintiff argues that the ALJ selectively discussed the facts and failed to consider the record as a whole, as it supports Dr. Watkins' opinion.  (ECF No. 17 at 12.)  Plaintiff acknowledges that Dr. Watkins assigned a GAF score of 60 with moderate difficulty in social, occupational, or school functioning.  (*Id.* at 13.)  But Plaintiff then points out that Dr. Watkins assigned a GAF score of 50 with moderate to great difficulty in social, occupational, or school functioning in July 2015.  (*Id.*)  Plaintiff cites to MFT Fogle's August 19, 2015 Progress Notes, wherein she assessed severe symptoms and assigned a GAF score of 41–51.  (*Id.*)  Plaintiff indicates that Dr. Watkins also opined in his September 2015 Progress Notes that Plaintiff continued to isolate due to severe agoraphobia, had an anxious mood, constricted affect, and impaired judgment.  (*Id.*)  As for his November 5, 2015 visit with Dr. Pratt, Plaintiff states that Dr. Pratt was dismissive to his complaints and did not give him an opportunity to communicate his symptoms.  (*Id.* at 13–14.)  Plaintiff contends that his claims of the severity of his impairments are validated once he transferred doctors, where Dr. Schuermeyer indicated that Plaintiff's condition is "worsening" despite good compliance.  (*Id.* at 14.)  Plaintiff claims that references to "mild" or "moderate" symptoms are isolated from the overall record and not representative of Plaintiff's functioning.  (*Id.*)

Defendant argues that the ALJ reasonably found that the weight of the medical evidence undermined additional restrictions, and aside from mood-related findings, Plaintiff's mental-status examinations were normal.  (ECF No. 20 at 5.)  Defendant argues that the Plaintiff is the one who cherry picks evidence to support his argument and that the Court should focus on the ALJ's interpretation of the evidence, not Plaintiff's.  (*Id.* at 7.)

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  *Bayliss*, 427 F.3d at 1216; *see also Reddick*, 157 F.3d at 725 ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion.").  "The

22

ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751; *see also Trevizo*, 871 F.3d at 675.  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." *Reddick*, 157 F.3d at 725.  "'The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison*, 759 F.3d at 1009 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner."  *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 524 (9th Cir. 2014) (citing *Reddick*, 157 F.3d at 720–21).

Here, Plaintiff claims that the ALJ selectively discussed the evidence by disregarding contradictory evidence and that the record as a whole supports Dr. Watkins' opinion. (*See* ECF No. 17 at 12.)  While looking at the specific visits that Plaintiff points out in his brief can lead to the interpretation that Plaintiff's symptoms were severe and continually worsening.  However, as discussed above, the record as a whole is actually inconsistent with Dr. Watkins' opinion.  *See* Section A(3)(d).  The Court agrees with the Defendant, in that Plaintiff focuses on a few instances where Progress Notes indicated that Plaintiff had lower GAF scores and more severe symptoms.  As the ALJ correctly indicated in his written decision, a majority of the Progress Notes in the record indicated that Plaintiff's symptoms were moderate with GAF scores typically between 51–61, with a few instances of Plaintiff having severe symptoms with GAF scores of 41–51 as well as a few instances of him having mild symptoms with GAF scores of 61–71. (*See* AR 35, 335, 337, 541, 543, 546, 548, 550, 552, 554, 557, 559, 560, 563, 565.)

The Court disagrees with Plaintiff's argument that the ALJ selectively discussed the facts and did not address the conflicting evidence.  Directly following the ALJ's discussion of Dr. Watkins' opinion, the ALJ referred to the other Progress Notes in the record and addressed conflicting evidence.  (*See* AR 35.)  The ALJ indicated that "[t]he record includes a variety of [ ] (GAF) scores ranging from 51–60 mostly through 2015 and 2016,

41–51 on one occasion, and 71–80 on another occasion. [. . .] The undersigned considered these scores, which were mainly in the moderate range, and gave them some weight." (*Id.*) Although this explanation may not be sufficient for Plaintiff, an ALJ does not need to "reconcile explicitly every conflicting shred of medical testimony." *Smith v. Comm'r of Soc. Sec.*, 337 F. Supp. 3d 216, 226 (W.D.N.Y. 2018) (citing *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008)). Plaintiff's argument is just an alternative and more narrow interpretation of the evidence, and even if such interpretation could give a more favorable inference for the Plaintiff, the Court will not second guess the ALJ's reasonable judgment. *See Mendoza v. Saul*, No. 1:18-CV-00925-SKO, 2019 WL 4189686, at *9–*10 (E.D. Cal. Sept. 2019) (citing *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012)). Here, the ALJ provided a thorough summary of the facts and conflicting evidence, stated his interpretation, and decided to give Dr. Watkins' October opinion letter very little weight. *See Trevizo*, 871 F.3d at 675. Accordingly, the Court finds that the ALJ did not error as to this issue.

### g.  Harmless Error

Because the Court finds that the ALJ failed to provide specific and legitimate reasons in discounting Dr. Watkins' opinion as to one reason (*See* Section A(3)(e) [Conservative Treatment]), the Court must review for harmless error. "ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination.'" *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015) (quoting *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). "[W]here the magnitude of an ALJ error is more significant, then the degree of certainty of harmlessness must also be heightened before an error can be determined to be harmless." *Id.*

Here, the ALJ's error would be inconsequential to the ultimate determination that the ALJ properly rejected Plaintiff's treating physician's opinion letter. As indicated above, the Court has already provided multiple specific and legitimate reasons for rejecting Dr. Watkins' opinion letter. The Court found that the ALJ reasonably rejected Dr. Watkins' opinion for being conclusive statement; having a short and infrequent treatment

relationship; and being inconsistent with the record as a whole, including his own Progress Notes.  Despite finding that the ALJ erred as to whether Dr. Watkins' treatment was conservative, there is substantial evidence supporting the ALJ's decision.  The ALJ's error does not negate the validity to the ALJ's conclusion.  *See Batson*, 359 F.3d at 1197 (finding that the ALJ's error was harmless, where there was substantial evidence supporting the other reasons for the ALJ's decision and the error did not negate the validity).  Therefore, any error by the ALJ as to dismissing Dr. Watkins' opinion is harmless.

### B. Failure to Properly Evaluate Plaintiff's Subjective Complaints

#### 1.  Applicable Standard

The ALJ must engage "in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." *Garrison*, 759 F.3d at 1014 (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).  At the first step, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*  "Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991)).

If the claimant satisfies the first step and there is no determination of malingering by the ALJ, "the ALJ must provide 'specific, clear, and convincing reasons for' rejecting the claimant's testimony regarding the severity of the claimant's symptoms." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)); *Garrison*, 759 F.3d at 1014–15; *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007)).

These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284;

*see also Parra*, 481 F.3d at 750 ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints.").  The Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony from a claimant [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony." *Treichler*, 775 F.3d at 1102; *see also Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020) ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining."); *Parra*, 481 F.3d at 750 ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints."); *Smolen*, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *Lester*, 81 F.3d at 834 ("[T]he ALJ must identify what testimony is not credible and what evidence the claimant's complaints.").

In weighing the credibility of a plaintiff's testimony, the ALJ may use "ordinary techniques of credibility determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (citing *Smolen*, 80 F.3d at 1284).  "To support a lack of credibility finding, the ALJ [is] required to point to specific facts in the record[.]"  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citing *Vasquez v. Astrue,* 572 F.3d 586, 592 (9th Cir. 2009)). The ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Thomas*, 278 F.3d at 958–59; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749–50 (9th Cir. 1995)).  However, if the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing. *See Thomas*, 278 F.3d at 959 (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999)).

### 2.  The ALJ's Findings

In determining whether the Plaintiff presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged, the ALJ found that Plaintiff had some limitations, but the "evidence [did] not substantiate restrictions more limited than the ability to understanding, remembering, and carrying out simple instructions for simple repetitive tasks with no interaction with the general public, occasional interaction with coworkers, no teamwork, and no production-based or quota-based performance as set forth in the residual functional capacity."  (AR 31.)  The ALJ summarized Plaintiff's medical records as to Plaintiff's complaints regarding his anxiety and panic attacks with Agoraphobia.  (*See* AR 31–32.)  The ALJ then concluded that Plaintiff's "course of treatment and alleged symptoms [. . .] support the existence of some limitations as set forth in the residual functional capacity, but do not correlate with greater restrictions as alleged by the [Plaintiff]."  (AR 32.)

The ALJ looked at Plaintiff's allegations regarding depression and indicated that they are "somewhat supported by the record, but the evidence does not substantiate restrictions more limited than" what is listed in the RFC determination and summarized the record as it relates to Plaintiff's depression.  (*Id.*)  The ALJ then indicated that the record includes evidence of alcohol dependency and THC abuse, and noted that Plaintiff used these to help cope with his impairments, while being in early remission.  (*Id.*)  The ALJ concluded that he "finds that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"  (*Id.*)

As to Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms, the ALJ found that Plaintiff's statements were inconsistent with the medical records, and the record as a whole, to indicate a more restrictive residual functional capacity than what had been given.  (AR 33.)

To support the reasons for his decision, the ALJ first stated that based on the course of treatment and contemporaneous treatment notes, "[Plaintiff's] purpose for mental health treatment after he stopped working appeared to be focused on 'getting disability' payments rather than being treated for his mental health symptoms."  (*Id.*) The ALJ cited to multiple correspondences where Plaintiff asked medical providers to approve his disability and remove alcohol dependency from his chart so it would not negatively impact his application.  (*Id.*)  Further, the ALJ pointed to Plaintiff's understanding of the Social Security disability regulations in needing a documented disability for at least 12 months to supports his reasoning, since Plaintiff's psychiatric treatment appeared to occur within a 12-month period during 2015 and 2016, with "little to no evidence of further therapy and psychiatric treatment in 2017 and 2018." (*Id.*)  The ALJ also supported his reasoning by showing that Plaintiff's ability to email medical providers regular and manage different disability applications as examples of Plaintiff's ability to complete task with adequate concentration.  (*Id.*)

The ALJ then reasoned that Plaintiff's progress towards his goals were poor because of his noncompliance.  (*Id.*)  As an example, the ALJ cited to Dr. Pratt's November 5, 2015 notes, wherein Dr. Pratt stated that "[Plaintiff] essentially refused" to walk around the block with his mother.  (*Id.*; *see also* AR 551–52.)  The ALJ stated that despite the noncompliance, Plaintiff's symptoms were noted as mild and was generally functioning pretty well with meaningful social relationships.  (AR 33) (citing AR 551–52, 559).  The ALJ cited to Plaintiff helping his sister move on May 4, 2015 in support of this statement.  (*Id.*; *see also* AR 453–54.)

In regard to Plaintiff's testimony that his agoraphobia was so bad for the month leading up to the hearing that he urinated in water bottles because he did not want to leave the room, the ALJ reasoned that the treatment notes during the insured period showed that this was due to external factors, such as playing sudoku/video games, being allergic to his mother's dog and not wanting to interact with his mother's boyfriend.  (AR 33) (citing AR 344, 550–51).

The ALJ reasoned that the Plaintiff's testimony regarding excessively missing work during the months leading up to the alleged onset date of March 23, 2015 is not supported by his pay stub history.  (AR 33–34) (citing AR 308–21[Pay stubs]).  The ALJ determined that the Plaintiff had not excessively missed work since the pay stubs, dated from October 11, 2015 to March 27, 2015, indicated that Plaintiff had claimed sick time for only two percent of his work time during that period.  (AR 33–34.)  The ALJ indicated that the amount of sick time that was calculated would not typically cause one to lose their job for excessively missing work.  (AR 34.)

The ALJ also dismissed Plaintiff's claim that the January 2014 incident of being struck in the face contributed to him not wanting to leave the house, since this occurred almost a year before the alleged onset date and Plaintiff was able to sustain employment during that time.  (AR 34.)  The ALJ acknowledged that the record supports some limitations, but that "[Plaintiff's] allegations of the intensity, persistence, and limiting effects of his symptoms are inconsistent with the record as a whole."  (*Id.*)

### 3. Analysis

#### a. Mental Limitations Finding

In finding that the Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms, specifically referring to Plaintiff's mental limitations, the ALJ found that Plaintiff's "allegations of generalized anxiety disorder with panic disorder and its associated limitations are somewhat supported by the record, but the evidence does not substantiate restrictions more limited than the ability to understanding, remembering, and carrying out simple instructions for simple repetitive tasks with no interaction with the general public, occasional interaction with coworkers, no teamwork, and no production-based or quota-based performance as set forth in the residual functional capacity."  (*See* AR 31–32.)   The ALJ then summarized Plaintiff's complaints during his medical consultations and the treatment he received.  (*See id.*)  The ALJ concluded that the Plaintiff's "course of treatment and alleged symptoms [. . .] support the existence of some

limitations as set forth in the residual functional capacity, but do not correlate with greater restrictions as alleged by the [Plaintiff]."  (AR 32.)

What the ALJ failed to do was identify and explain the evidence in his summary of the record which he found that undermined the Plaintiff's complaints regarding the severity of his symptoms.  *See Lambert*, 980 F.3d at 1278 (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015)) ("Although the ALJ did provide a relatively detailed overview of Lambert's medical history, 'providing a summary of medical evidence [. . .] is not the same as providing clear and convincing reasons for finding the claimant's symptom testimony not credible.'").  Although the decision found that the evidence did not provide for greater restrictions alleged by the Plaintiff, the ALJ did not identify which of Plaintiff's complaints were inconsistent with the treatment he received nor did the ALJ identify what greater restrictions were alleged by the Plaintiff that he finds were unwarranted.  The ALJ's mental limitations finding as to Plaintiff's generalized anxiety disorder and panic disorder lacked analysis and only provided conclusory findings.  This is insufficient.  The ALJ was required to identify what testimony was not credible and what evidence undermined the Plaintiff's complaints.  *Lester*, 81 F.3d at 834.

As for Plaintiff's allegations of depression and its associated limitations, the ALJ found that they are "somewhat supported by the record, but the evidence does not substantiate restrictions more limited than the ability to understanding, remembering, and carrying out simple instructions for simple repetitive tasks with no interaction with the general public, occasional interaction with coworkers, no teamwork, and no production-based or quota-based performance as set forth in the residual functional capacity."  (AR 32.)  The ALJ then provided a brief summary of Plaintiff's complaints about depression and the treatment he received.  (*Id.*)  However, the ALJ did not provide specific reasons for why he discounted Plaintiff's allegations of depression nor did he explain why the evidence did not substantiate more limited restrictions.  *See Brown-Hunter*, 806 F.3d at 494 ("Our review of the ALJ's written decision reveals that she did not specifically identify any such inconsistencies; she simply stated her non-credibility conclusion and then

summarized the medical evidence supporting her RFC determination. This is not the sort of explanation or the kind of 'specific reasons' we must have in order to review the ALJ's decision meaningfully, so that we may ensure that the claimant's testimony was not arbitrarily discredited.")  The ALJ's conclusory finding as to Plaintiff's depression also lacked analysis and failed to identify what testimony was not credible and what evidence undermined the Plaintiff's complaints.  *See Lester*, 81 F.3d at 834.

Finally, the ALJ provided evidence in the record of Plaintiff's alcohol dependency and THC abuse.  (AR 32.)  Yet, the ALJ did not provide any analysis or explanation as to why evidence of Plaintiff's history of alcohol dependency and substance abuse factors into his discrediting of the Plaintiff's complaints as to the severity of his symptoms.[6]  Although Plaintiff testified at the hearing about previously using alcohol to alleviate his anxiety, Plaintiff claimed that he has not been dependent on alcohol and stated that has not touched alcohol since he moved in with his mother in 2015.  (AR 109–10.)  The ALJ did not address this testimony in his summary nor did the ALJ provide specific reasons to discount it.

In sum, to the extent the ALJ discredited Plaintiff's complaints in this section of his opinion, the ALJ's assessment is not supported by substantial evidence for the reasons stated above.

///

///

---

[6] The Ninth Circuit has upheld adverse credibility findings by ALJs where a claimant's testimony and various statements regarding alcohol and substance abuse were inconsistent.  *See*, *e.g.*, *Thomas*, 278 F.3d at 959; *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999); *Miller v. Colvin*, No. 1:15-CV-0063-JLT, 2016 WL 4702757, at *8 (E.D. Cal. Sept. 2016) (finding that Plaintiff's inconsistent statements regarding his substance abuse supported the ALJ's adverse credibility determination); *Walker v. Astrue*, No. 1:10CV0920 DLB, 2011 WL 590599, at *11 (E.D. Cal. Feb. 2011) ("An ALJ may properly consider inconsistent statements regarding drug use as diminishing a claimant's credibility").  However, a history of substance abuse, with nothing more, is insufficient to discredit a claimant's testimony. *See Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1262 (W.D. Wash 2010) ("discounting plaintiff's credibility because of her substance abuse...history was improper, given that it bears little relevance to plaintiff's tendency to tell the truth"); *Johnson v. Barnhart*, 312 F. Supp. 2d 415, 429 (W.D.N.Y. 2003) (holding that SSR 96-7p requires more than "history of alcoholism and drug abuse" to discredit the plaintiff's testimony).

### b.   The Intensity, Persistence, and Limiting Effects of Plaintiff's Symptoms Finding

The ALJ found that Plaintiff's statements about the "intensity, persistence, and limiting effects of his symptoms are inconsistent with the medical records and the record as a whole [. . .] to indicate a more restrictive residual functional capacity[.]"  (AR 33.) Since the ALJ did not find Plaintiff was malingering, the issue is whether the ALJ provided "specific, clear, and convincing reasons" for rejecting Plaintiff's testimony regarding the severity of his symptoms, while identifying "the specific testimony" the ALJ found "not to be credible" and "explaining what evidence undermine[d] Plaintiff's testimony."  *See Treichler*, 775 F.3d at 1102.  The Court addresses each reason in turn.

### 1.   Statements Inconsistent with Medical Records

In finding that the Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record, the ALJ first indicated that "based on the claimant's course of treatment and contemporaneous treatment notes, [Plaintiff's] purpose for mental health treatment after he stopped working appeared to be focused on 'getting disability' payments rather than being treated for his mental health symptoms."  (AR 33.)  To support his reasoning, the ALJ focused on the medical records, where Plaintiff asked for medical providers to "approve his disability" and specifically asked for alcohol dependence to be removed from his medical chart.  (*Id.*)  The ALJ commented that the Plaintiff had an "understanding of social security disability regulations," which was shown by Plaintiff's medical records only showing psychiatric treatment for a 12-month period during 2015 and 2016, with "no evidence of further therapy and psychiatric treatment in 2017 and 2018."  (*Id.*)

Plaintiff argues that inquiries regarding disability is not a convincing reason to reject Plaintiff's subjective reports of having disabling symptoms.  (ECF No. 17 at 15–16.)  Plaintiff states that it is reasonable that he requested this information from his physicians to support his disability application due to his anxiety surrounding not being able to support himself while not being able to work.  (*Id.* at 16.)  Plaintiff states that

1  the record does not support the ALJ's assertion that Plaintiff pursued only 12 months

2  of psychiatric care in order to secure disability payments, since the treatment records

3  for Plaintiff's physical impairments after February 2016 include references to ongoing

4  psychiatric care and the ALJ failed to obtain Plaintiff's complete medical history.[7]  (*Id.*

5  at 17.)

6  Defendant argues that the ALJ properly weighed Plaintiff's subjective

7  allegations and found that the record contradicted Plaintiff's allegations of disabling

8  limitations.  (ECF No. 20 at 8–9.)  Defendant states that the ALJ did not merely rely

9  on evidence regarding Plaintiff gathering evidence to support his disability application,

10  but relied on the fact that Plaintiff attempted to withhold information from the agency

11  by trying to remove alcohol dependence from his medical records because he believed

12  that it would negatively impact his disability application.  (*Id.* at 9–10.)  Defendant

13  states that the record only reflects therapy/psychiatric treatment from 2015 and 2016,

14  while containing "little to no evidence" of further treatment in 2017 and 2018.  (*Id.* at

15  8–9.)  Defendant argues that it was the Plaintiff's responsibility for submitting

16  evidence to support his claim that he received treatment after 2016.  (*Id.* at 12.)

17  In his Reply, Plaintiff argues that the ALJ erroneously focused on finding Plaintiff

18  to be untruthful, instead of considering evidence of his severe symptoms, and failed to

19  provide clear and convincing reasons for discrediting Plaintiff's subjective reports and

20  symptoms.  (ECF No. 21 at 6–7.)  Plaintiff states that he was not "focused on getting

21  disability," reiterating that the treatment records indicate that he sought help due to fear of

22  losing his job, felt out of control in his life, and continued psychiatric treatment throughout

23  the relevant period.  (*Id.* at 6.)  Plaintiff states that he did not withhold information, stating

24

25

26

27  [7] Although the ALJ indicated that "the records [were] all up to date[,]" Plaintiff's counsel states that the case had been transferred between law firms when the record was developed and could not verify whether

28  the appropriate medical records had been requested and submitted.  (ECF No. 17 at 17 n.1; *see also* AR 66–67, 75–78.)

that he was worried about its implication in his disability case and desired the medical records to reflect that has been working towards sobriety. (*Id.*)

In rejecting a claimant's testimony, the Ninth Circuit "require[s] the ALJ to 'specifically identify the testimony from a claimant [the ALJ] finds not to be credible and . . . explain what evidence undermines this testimony." *Lambert*, 980 F.3d at 1268 (citing *Treichler*, 775 F.3d at 1102); *see also Parra*, 481 F.3d at 750 ("The ALJ must provide clear and convincing reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints."); *Smolen*, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); *Lester*, 81 F.3d at 834 ("[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."). "To support a lack of credibility finding, the ALJ [is] required to point to specific facts in the record[.]" *Burrell*, 775 F.3d at 1138 (citing *Vasquez*, 572 F.3d at 592). An ALJ's failure to do so is error. *See Brown-Hunter*, 806 F.3d at 494 ("Because the ALJ failed to identify the testimony she found not credible, she did not link that testimony to the particular parts of the record supporting her non-credibility determination. This was legal error.").

The first problem with the ALJ's finding is that he did not specifically identify which statements he is referring to that he claimed were inconsistent with Plaintiff's medical records. *See Lambert*, 980 F.3d at 1268. Further, the ALJ also failed to specifically identify the medical records that undermined Plaintiff's statements. *See id.* Instead of addressing what medical records were inconsistent with Plaintiff's statements, the ALJ suggested that Plaintiff's purpose for seeking mental health treatment after he stopped working was to get disability payments, as opposed to being treated for his mental health symptoms. (*See* AR 33.) In support of this conclusion, the ALJ cited to Plaintiff's repeated requests to approve his disability, Plaintiff's knowledge of the regulation requiring the disability be documented for at least 12 months, and Plaintiff's medical record including little to no evidence of further treatment throughout 2017 and 2018. (*Id.*)

In weighing the credibility of a plaintiff's testimony, the ALJ may use "ordinary techniques of credibility determination." *Tommasetti*, 533 F.3d at 1040 (citing *Smolen*, 80 F.3d at 1284). The ALJ may consider the "inconsistencies either in [Plaintiff's] testimony or between [Plaintiff's] testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains." *Light*, 119 F.3d at 792. Motive is an ordinary technique to discredit testimony. The ALJ raised the inference that Plaintiff's motive behind getting mental health treatment was solely for the monetary benefits. In other words, Plaintiff did not really need the psychiatric treatment that he alleged he needed in 2015 and 2016.

The Court finds that this inference by the ALJ is not supported by substantial evidence. First, it is reasonable to conclude that all claimants alleging disability are seeking the benefits provided by such a finding. Plaintiff is no different. The fact that he educated himself on the regulations, in the Court's view, does not lead to the conclusion that he is faking or otherwise exaggerating his symptoms. In fact, Plaintiff's testimony as to the medications he was prescribed and their effects on his ability to concentrate contradict such an inference. (*See* AR 98–101.) The ALJ failed to take into account Plaintiff's testimony, as well as his prescribed medications, when making this inference. It is also reasonable to assume that physicians do not abandon their duty of care when prescribing medications to enable a patient to get disability benefits.[8] Therefore, to the extent that the ALJ rejected

---

[8] If Plaintiff sought no treatment for his alleged disabilities after the year requirement, such conduct would tend to support the ALJ's inference as to motive. The issue presented is whether such an inference is accurate. Although it is unclear to this Court on whether Plaintiff sought treatment during 2017 and 2018, Plaintiff correctly points out that the record does indicate some treatment during 2017. (*See* ECF No. 17 at 17.) For example, on March 1, 2017, Dr. Liu indicated that Plaintiff was on Clonidine for the previous month and it seemed to help with his anxiety than previous medications. (AR 879.) Although Dr. Liu indicated that Plaintiff was taking Clonidine once a day, she indicated in Plaintiff's plan that he could even take it twice a day. (*Id.*) On March 25, 2017, Dr. Lavallo listed Generalized Anxiety Disorder and Panic disorder under Plaintiff's active problems, while continuing the Clonidine prescription and restarting Xanax. (AR 898.) On June 19, 2017, Dr. Liu listed Clonidine and Xanax as medications that Plaintiff was taking at the time of the visit. (AR 922.)

Plaintiff's testimony for being inconsistent with the medical records, the Court concludes that the ALJ's finding is not supported by substantial evidence.

### 2. Ability to Email

The ALJ found that "[Plaintiff's] ability to email his medical providers regularly regarding his lab results and to manage the different type of disability/unemployment applications, for example, demonstrates his ability to complete tasks with adequate concentration." (AR 33.)

In determining a claimant's credibility, an ALJ may consider "whether the claimant engages in daily activities inconsistent with alleged symptoms[.]" *Lingenfelter*, 504 F.3d at 1040. Specifically, daily activities may be grounds for discrediting a claimant's testimony when a claimant "is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Even when such activities suggest some difficulty functioning, the ALJ may discredit a claimant's testimony to the extent that they contradict claims of a totally debilitating impairment. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Valentine*, 574 F.3d at 693. However, this Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins*, 466 F.3d at 882.

In this case, the ALJ simply ignored Plaintiff's testimony in regard to his use of email. Plaintiff testified that a major symptom of his anxiety and panic attacks was leaving his room to go to work and then interact with others. (AR 91–92.) Plaintiff then indicated that he was looking for work online to try to work remotely. (AR 95.) Plaintiff testified that he sent his resume out in those attempts to find work. (AR 97.) However, it became clear to the Plaintiff that he also could not do online jobs because he could not keep a schedule. (*Id.*) Plaintiff testified that he is "on heavy medications and they make—they impair [him], so [his] thinking is impaired as well." (AR 98.) Plaintiff also testified that he was unable to have a stable job due to his condition, where "[he] never know[s] when

[he is] going to be too sedated by the tons of meds [he is] taking or whether [he is] so built up anxious that [he] just physically cannot do it mentally."  (AR 82–83.)

While the Plaintiff may be able to email his medical providers and manage the different type of disability/unemployment applications as the ALJ claimed, this ability does not necessarily transfer to a work setting, given Plaintiff's inability to concentrate when taking medications for his impairments.  Since the ALJ did not address this testimony nor whether Plaintiff's conduct was transferrable to a work setting, the ALJ's reason for discounting Plaintiff's statements is not clear and convincing.  *See Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. 2017) ("[T]he ALJ was required, at the least, to provide germane reasons for rejecting testimony that corroborates a claimant's pain testimony.").  Therefore, the Court finds that the ALJ erred as to this basis.

### 3.  Noncompliance

Another reason that the ALJ found for discrediting Plaintiff's testimony was that Plaintiff's "progress toward his goals were poor because of his noncompliance" and indicated that Plaintiff "refused to try recommended treatment such as taking walks with his mother to get outside the house."  (AR 33) (citing AR 551.)

Plaintiff argues that the ALJ's assertion that Plaintiff's symptoms only remained severe due to noncompliance is not a convincing reason for rejecting the severity of Plaintiff's symptoms.  (ECF No. 17 at 18.)  Plaintiff claims that the ALJ isolated the minimal references to noncompliance in the treatment records and failed to acknowledge that Plaintiff was overwhelmingly compliant with medications and treatment.  (*Id.* at 18.)  Plaintiff states that there is no evidence that Plaintiff was consistently or deliberately noncompliant with treatment or that his conditions improved when fully compliant.  (*Id.* at 18.)

Defendant claims that Plaintiff's argument that he was sometimes compliant with his treatment is consistent with the ALJ's decision.  (ECF No. 20 at 10.)  Defendant states that the ALJ relied on Plaintiff's reports of noncompliance "some of the time" and found that the record demonstrated some noncompliance.  (*Id.* at 10–11.)

1
2
3
4

In his Reply, Plaintiff argues that the record indicates that he was "overwhelmingly compliant with medications and treatment." (ECF No. 21 at 6–7.)  Plaintiff admits that he was resistant to recommendations, but claims that this is consistent with agoraphobia and a symptom of his impairments.  (*Id.* at 7.)

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

In assessing a claimant's credibility, we have long held that an ALJ may properly rely on "'unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80 F.3d at 1284); *Fair*, 885 F.2d at 603.  According to agency rules, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  SSR 96–7p. Moreover, a claimant's failure to assert a good reason for not seeking treatment, "or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony."  *Fair,* 885 F.2d at 603.  However, the Ninth Circuit has repeatedly remarked that "it is a questionable practice to chastise one with mental impairment for the exercise of poor judgment in seeking rehabilitation" and that it is inappropriate to punish the mentally ill for occasionally going off their treatment, especially if one can attribute part of the reason for noncompliance to the "underlying mental afflictions."  *Guzman v. Berryhill*, 356 F. Supp. 3d 1025, 1038 (S.D. Cal. 2018) (citing *Garrison*, 759 F.3d at 1018 n.24).

21
22
23
24
25
26
27
28

Looking at the record as a whole, the Court finds that the ALJ's basis for discrediting Plaintiff's testimony due to his noncompliance is not supported by substantial evidence. For example, Dr. Watkins' July 29, 2015 Progress Notes indicated that even with "fair" compliance, Plaintiff's condition was unchanged and gave a GAF score of 50.  (AR 541.) MFT Fogle's August 19, 2015 Progress Notes indicated that Plaintiff was noncompliant some of the time and that Plaintiff had a moderate impairment, severe symptoms, with a GAF score of 41–51.  (AR 542–43.)  Then on September 9, 2015, Dr. Watkins' stated that

Plaintiff has "good" compliance with his treatment, but "remains very anxious and isolating himself as a result of his agoraphobia" and assigned a GAF score of 60–51. (AR 545–46.)

On October 7, 2015, MFT Fogle noted that Plaintiff was "hesitant, but open" to complying with treatment and noted that Plaintiff's overall impairment was "great" with severe/intolerable symptoms. (AR 547.) MFT Fogle's October 20, 2015 Progress Notes indicated that Plaintiff was noncompliant some of the time, while Plaintiff's overall impairment was "great" and had moderate symptoms. (AR 549.) On November 5, 2015, Dr. Pratt noted that Plaintiff's condition is unstable, with treatment compliance being poor since Plaintiff "essentially refused" walking around the block with his mother. (AR 552.) MFT Fogle's November 16, 2015 Progress Notes indicated that Plaintiff was noncompliant some of the time and that Plaintiff's overall impairment was "great" with severe symptoms and a GAF score of 60–51. (AR 553–54.)

On November 23, 2015, Plaintiff met with Dr. Schuermeyer, who opined that despite Plaintiff having good compliance with his treatment, Plaintiff still "continues to have intense anxiety surrounding leaving his room" and that Plaintiff's condition is "worsening." (AR 556.) On December 2, 2015, MFT Fogle noted that Plaintiff is compliant most of the time and his progress toward his treatment plan goals were good. (AR 558.) MFT Fogle's December 16, 2015 Progress Notes indicated that Plaintiff is compliant most of the time and his progress toward his treatment plan goals were fair. (AR 560.) However, MFT Fogle noted that Plaintiff's overall impairment was "between moderate and great" and that Plaintiff's symptoms were "moderate and frequently intolerable." (*Id.*)

In his December 29, 2015 Progress Notes, Dr. Schuermeyer stated that Plaintiff's "[c]ondition is unchanged" despite having good compliance with his treatment. (AR 563.) Dr. Schuermeyer then assigned a GAF score of 51–41, with serious symptoms. (*Id.*) MFT Fogle's January 13, 2016 Progress Notes indicated that Plaintiff was noncompliant some of the time and his progress toward his treatment plan goals were fair. (AR 565.) However,

MFT Fogle still noted that Plaintiff's overall impairment was "great" and noted that his symptoms were moderate.  (AR 565.)

It appears to the Court that the ALJ did not take into account Plaintiff's overall performance as proffered, and rather focused on the several instances of noncompliance. Moreover, Plaintiff testified about his inability to leave his room due to his severe impairments, even to go to the restroom and shower, which could explain why the Plaintiff did not go for walks.  (*See* AR 118–19.)  Yet, the ALJ did not address this testimony when making the finding that Plaintiff refused to take walks or why the inconsistencies in the record do not affect his finding.  (*See* AR 33.)  The ALJ's decision failed to acknowledge Plaintiff's compliance with his treatment and whether his impairments affected his ability to comply with such treatments.  Therefore, the Court concludes that the ALJ's finding is not supported by substantial evidence.

### 4. Progress Notes Indicating Mild Symptoms

The ALJ found that "despite [Plaintiff's] unstable condition and some reported noncompliance, his symptoms were noted as mild and that he was generally functioning pretty well with some meaningful social relationships. [. . .] For example, he helped his sister move."  (AR 33.)  In support of this reason, the ALJ cited to Dr. Pratt's November 5, 2015 Progress Notes and MFT Fogle's December 2, 2015 Progress Notes, wherein both physicians indicated that Plaintiff had "[m]ild symptoms," "[h]as some meaningful social relationships," and "[g]enerally functioning pretty well."  (AR 552, 559.)  Although these two visits provide support for his finding, the ALJ must also consider the entire medical record to support a finding of clear and convincing evidence.  *See Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) ("ALJ's specific reason for rejecting Dr. Hsieh's medical opinion is not supported by substantial evidence. In concluding that the most recent medical evidence indicates that Holohan was improving, the ALJ selectively relied on some entries in Holohan's records from San Francisco General Hospital and ignored the many others that indicated continued, severe impairment.").

When assessing a claimant's credibility, the ALJ may consider inconsistent medical evidence as a factor in his credibility analysis. *See Lingenfelter*, 504 F.3d at 1040 (finding that the ALJ may consider whether the alleged symptoms are consistent with the medical evidence in determining credibility). However, the ALJ is required to provide reasons for rejecting medical evidence that corroborates Plaintiff's symptom testimony. *See Leon*, 880 F.3d at 1046 ("[T]he ALJ was required, at the least, to provide germane reasons for rejecting testimony that corroborates a claimant's pain testimony."); *Taylor v. Comm'r of Soc. Sec. Admin*, 659 F.3d 1228, 1234 (9th Cir. 2011); *see also* 20 C.F.R. § 404.1527 (evaluating opinion evidence for claims filed before March 27, 2017).

Looking at the entire record as a whole, the Court finds that the medical record is inconsistent with the ALJ's finding that Plaintiff's symptoms were mild and that he was generally functioning pretty well with some meaningful social relationships despite his condition and noncompliance. Plaintiffs symptoms/impairments were consistently listed between moderate to great, while sometimes being listed as severe. (AR 541, 542–43, 546, 547, 549, 554, 556, 560, 563, 565.) For example, Dr. Gray's May 20, 2015 Progress Notes indicated that Plaintiff's overall impairment was "moderate to great" and the severity of his symptoms were "moderate to severe," while assigning a GAF score of 60. (AR 334–35.) On June 9, 2015, Dr. Watkins stated that Plaintiff suffers from an anxiety disorder and panic disorder, while assigning a GAF score of 60 with moderate difficulty in social, occupation, or school functioning. (AR 337.)

Dr. Watkins' July 29, 2015 Progress Notes indicated that Plaintiff's condition was unchanged and noted that "[he] remains disabled by his very high anxiety at this time." (AR 541.) Dr. Watkins then assigned a GAF score of 50, with moderate to great difficulty in social occupational, or school functioning due to anxiety. (*Id.*) MFT Fogle's August 19, 2015 Progress Notes indicated that Plaintiff had a moderate impairment, along with severe symptoms, and assigned a GAF score of 41–51. (AR 542–43.) In his September 9, 2015 Progress Notes, Dr. Watkins stated that Plaintiff "remains very anxious and isolating himself as a result of his agoraphobia." (AR 545.) As to the intensity of Plaintiff's other

psychosocial and environmental problems, Dr. Watkins' indicated that it was "great." (AR 546.)  Dr. Watkins then gave a GAF score of 60–51, with moderate difficulty in social occupational, or school functioning due to anxiety.  (*Id.*)

MFT Fogle's October 7, 2015 Progress Notes indicated that Plaintiff's overall impairment was "great" and had severe and intolerable symptoms, with moderate difficulty in social, occupation, or school functioning.  (AR 547.)  Then on October 20, 2015, MFT Fogle noted that Plaintiff's overall impairment was "great" and had moderate symptoms, with moderate difficulty in social, occupation, or school functioning.  (AR 549.)  MFT Fogle's November 16, 2015 Progress Notes listed Plaintiff's overall impairment as "great" and noted that Plaintiff's symptoms were severe with a GAF score of 60–51 with moderate difficulty in social, occupation, or school functioning.  (AR 553–54.)  Dr. Schuermeyer indicated in his November 23, 2015 Progress Notes that Plaintiff "continues to have intense anxiety surrounding leaving his room" and that Plaintiff's condition is "worsening." (AR 556.)  Dr. Schuermeyer then assigned a GAF score of 60–51, with moderate difficulty in social occupational, or school functioning due to anxiety.  (AR 557.)

MFT Fogle's December 16, 2015 Progress Notes listed Plaintiff's overall impairment as being "between moderate and great" and noted that Plaintiff's symptoms were "moderate and frequently intolerable." (AR 560.)  MFT Fogle then gave a GAF score of 60–51 with moderate difficulty in social, occupation, or school functioning.  (*Id.*)  Dr. Schuermeyer's December 29, 2015 Progress Notes indicated that Plaintiff's "[c]ondition is unchanged." (AR 563.)  Dr. Schuermeyer gave a GAF score of 51–41, with serious symptoms and serious difficulty in social occupational, or school functioning due to anxiety.  (*Id.*)  On January 13, 2016, MFT Fogle listed Plaintiff's overall impairment as "great" and noted that Plaintiff's symptoms were moderate with a GAF score of 60–51 with moderate difficulty in social, occupation, or school functioning.  (AR 565.)

In sum, the ALJ's finding that Plaintiff had only mild symptoms and was functioning pretty well despite being noncompliant is not based on the entire record.  The ALJ did not provide any explanation for his conclusion and did not address why the inconsistencies

stated above did not affect his finding.  *See Garrison*, 759 F.3d at 1012.  Of importance, the ALJ failed to even acknowledge or discuss this contradictory evidence.  Therefore, the Court concludes that the ALJ's reliance on Plaintiff's alleged mild symptoms is not supported by substantial evidence.

### 5. External Factors

The ALJ found that Plaintiff's activities were inconsistent with his statements about the intensity, persistence, and limiting effects of his symptoms.  (AR 33.)  With regard to the Plaintiff testifying that his agoraphobia got so bad that he did not want to leave his room and urinated in water bottles, the ALJ found that "the treatment notes during the insured period explain that the claimant chose to stay in his room playing Sudoku and video games due to external factors in the home such as being allergic to his mother's dog and also not wanting to engage with his mother's boyfriend."  (*Id.*)

Plaintiff argues that the record "overwhelmingly documents [Plaintiff's] inability to leave his room or socialize due to anxiety" and was not simply a choice. (ECF No. 17 at 18.)  Plaintiff states that preferring to play sudoku/video games and avoid his Mother's boyfriend and dog do not undermine his complaints regarding agoraphobia, since feeling safe in his room as opposed to facing other members of the household are clearly symptoms of his impairments.  (*Id.*)  Plaintiff claims that there is no evidence that his Mother's boyfriend or dog were primary factors in contributing to Plaintiff's agoraphobic isolation, due to being isolated references.  (*Id.*)

Defendant argues that the ALJ only found that the exacerbation of symptoms prior to the hearing was not particularly relevant because the record shows that Plaintiff stayed in his room as a way to avoid external factors in his house, not because his impairments precluded him from leaving the room.  (ECF No. 20 at 11.)  Defendant points out that the ALJ did find that Plaintiff had severe medically determinable mental impairments that limited his functioning and was only addressing the exacerbation of Plaintiff's symptoms during the month prior to the hearing.  (*Id.*)

When weighing a claimant's credibility, the Ninth Circuit has recognized that an ALJ may consider the "inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work records, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which he complains." *Light*, 119 F.3d at 792; *see also Thomas*, 278 F.3d at 958–59; *Moncada*, 60 F.3d at 524. The issue presented is whether Plaintiff's treatment notes as a whole support the ALJ's finding that Plaintiff's reason for staying in his room was not due to his impairments, but rather for the reasons cited in the ALJ's opinion. Or does the record as a whole support Plaintiff's testimony about his inability to leave his room due to anxiety and his panic disorder. In reviewing an ALJ's decision, the Court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins*, 466 F.3d at 882. However, "[w]hen evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ." *Batson*, 359 F.3d at 1196.

Here, the ALJ reasoned that Plaintiff "chose to stay in his room playing Sudoku and video games due to external factors in the home such as being allergic to his mother's dog and also not wanting to engage with his mother's boyfriend" during the insured period. (AR 33.) The ALJ cited to Dr. Novales-Gomogda's May 5, 2015 Telephone Encounter Notes and Dr. Pratt's November 5, 2015 Progress Notes in support. (*Id.*) (citing AR 344, 551). Dr. Novales-Gomogda noted that "[Plaintiff] is not getting out of his room much because mom's boyfriend lives there and patient says he is 'weird.' [Plaintiff states that his mom's boyfriend] doesn't talk to him much, but he doesn't feel threatened by him there." (AR 344.) Further, Dr. Pratt noted that "[Plaintiff] has a cat in his room and mother has a dog. He stays in his room to avoid allergy of the dog hair??!! [. . .] I indicated that he must get out of the house and walk with his mother. He stays home in his room, doing sudoku or playing video games." (AR 551.)

Although there are indications that Plaintiff did not leave the house due to his mother's boyfriend and mother's dog, the record as a whole shows that these were isolated occurrences.  For example, Dr. Watkins indicated on July 29, 2015 that "[Plaintiff] remains very isolative in his room, too anxious to come out. Sometimes will miss meals because He's too anxious to come out and eat. [Plaintiff] did not attend last therapy session due to high anxiety."  (AR 539.)  On September 9, 2015, Dr. Watkins noted that Plaintiff "continues to isolate and rarely leaves his house. He was invited to go to a Padres game by his best friend from childhood and [Plaintiff] declined, even though he's always loved baseball, because he felt too uncomfortable to do so."  (AR 544.)  With regards to Plaintiff's fear of leaving the house for his appointment, MFT Fogle indicated that "therapy consisted of leading [Plaintiff] to understand that it is his distorted thinking that causes his anxiety. He had come to the conclusion that because on three separate occasions when he left the house adverse things occurred [. . .] that something would happen every time."  (AR 549.)  On November 23, 2015, Dr. Schuermeyer noted that Plaintiff "continues to have intense anxiety surrounding leaving his room" and has "anxiety and panic symptoms when simply interacting with his family."  (AR 556.)

The Court finds that the ALJ's conclusion is not fully consistent with the record and is not supported by substantial evidence.  Besides Dr. Novales-Gomogda's and Dr. Pratt's treatment notes, there is no indication from the record that Plaintiff's inability to leave his room was due to the reasons set forth by the ALJ and not Plaintiff's impairments. Further, the ALJ failed to give germane reasons for rejecting the contrary evidence discussed above.  *See Leon*, 880 F.3d at 1046 ("[T]he ALJ was required, at the least, to provide germane reasons for rejecting testimony that corroborates a claimant's pain testimony.").  In fact, the ALJ failed to acknowledge or discuss the contradictory evidence showing that Plaintiff's inability to leave his room was actually due to his impairments and did not address why this contradictory evidence did not affect his decision.  The ALJ's decision did not take into account the Plaintiff's entire medical record, as well as Plaintiff's

testimony, when making this conclusion.  Therefore, to the extent that the ALJ discounted Plaintiff's testimony regarding his inability to leave his room as being caused by external factors unrelated to his impairments, the Court concludes that the ALJ's finding is not supported by substantial evidence.

### 6. Excessively Missing Work

The ALJ lastly justified his conclusion that although the record supports some limitations, Plaintiff's allegations of the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record as a whole, as follows:

> Moreover, the claimant testified to excessively missing work during the months prior to his alleged onset date of March 23, 2015; however, a review his pay stub history shows otherwise. For the period from October 11, 2014 through March 27, 2015 (a total of twenty-four weeks), the claimant took only twenty hours of sick time. (Exhibits 23E-35E) Twenty hours of sick time over a twenty-four week period is an average of 0.83 hours of sick time per week (in other words, less than one hour per each 40-hour week); and this would result in .02 or 2% of time being off task due to being sick over that time period. Thus, the claimant's pay records show that he claimed sick time for only 2% of his work time, which would not typically cause one to lose their job for excessively missing work.

(AR 33–34.)  At the hearing, Plaintiff testified that he stopped working on March 17, 2015 due to his anxiety that prevented him from leaving the house and that he would have panic disorders every time he would try to leave.  (AR 80.)  The ALJ then asked whether the Plaintiff was calling in sick, to which Plaintiff replied "yes."  (*Id.*)  Plaintiff also testified that the issue surrounding his inability to leave the house began sometime between late December 2014 and early January 2015.  (AR 91.)

However, contrary to the ALJ's opinion, Plaintiff did not testify that he was excessively missing work due to taking sick leave.  (*See* AR 65–123.)  Nor did the Plaintiff testify that he lost his job due to taking excessive sick days.  (*See id.*)  It is unclear what inference the ALJ drew from his analysis of Plaintiff's sick time.  And the Court cannot infer this link.  *See Lambert*, 980 F.3d at 1278 (Rejecting a district court's attempt to "shore up the ALJ's decision" and explaining that "[a]lthough the inconsistencies identified by

the district court could be reasonable inferences drawn from the ALJ's summary of the evidence, the credibility determination is exclusively the ALJ's to make, and we are constrained to review the reasons the ALJ asserts."); *Patterson v. Comm'r of Soc. Sec. Admin.*, No. 15-2487, 2017 WL 218855, at *5 (4th Cir. 2017) (reversing and remanding a disability benefits denial because the ALJ failed to show his analysis and evaluation when assessing the claimant's RFC and indicated that a reviewing court "cannot fill in the blanks for the ALJ."); *Heather W. v. Saul*, No. 19-CV-00844-BGS, 2020 WL 7642597, at *11, *18 (S.D. Cal. Dec. 2020) ("[T]he Court cannot fill in the blanks by reviewing the record and providing support for the ALJ's conclusion. [. . .] [T]he ALJ failed to specify what portion of her testimony he finds to be inconsistent, the decision also lacks any explanation as to why the objective evidence of improvements undermines her testimony. And the Court cannot infer this link.").  Notwithstanding what inference the ALJ sought to draw, since the Plaintiff did not testify as the ALJ asserts, his conclusion is not supported by substantial evidence.

### c.  Harmless Error

"ALJ errors in social security cases are harmless if they are 'inconsequential to the ultimate nondisability determination.'"  *Marsh*, 792 F.3d at 1173 (quoting *Stout*, 454 F.3d at 1055–56); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (An ALJ's reliance on erroneous reasons is harmless so long as the "remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence").  "[W]here the magnitude of an ALJ error is more significant, then the degree of certainty of harmlessness must also be heightened before an error can be determined to be harmless." *Marsh*, 792 F.3d at 1173.

The Court cannot find the ALJ's erroneous rejection of Plaintiff's testimony harmless.  At Plaintiff's hearing, the vocational expert testified that Plaintiff would not be able to perform the occupations identified if he was going to be off task 15 minutes every hour, or even missed work twice a month, as a consequence of his symptom impairments and medication side effects.  (*See* AR 116.)  If Plaintiff's testimony of being unable to

leave his room due to his impairments or being unable to function due to his medication side effects is credited, there is no evidence in the record[9] that would indicate that there are jobs available to Plaintiff with his limitations.  Further, if Plaintiff's testimony is credited, it would likely be consequential to the ultimate disability determination.

### C. Remand is Required

"The rare circumstances that result in a direct award of benefits are not present in this case." *Leon*, 880 F.3d at 1047.  "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  *Id.* at 1045 (citing *Treichler*, 775 F.3d at 1099).  The credit-as-true analysis "permits, but does not require, a direct award of benefits on review but only where the [ALJ] has not provided sufficient reasoning for rejecting testimony and there are no outstanding issues on which further proceedings in the administrative court would be useful."  *Id.* at 1044.  Under the three-part rule, the Court first considers "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  *Id.* at 1045 (quoting *Garrison*, 759 F.3d at 1019).  This step is met for the reasons set forth above.

However, at the second step, the Court considers "whether there are 'outstanding issues that must be resolved before a disability determination can be made' and whether further administrative proceedings would be useful.'"  *Id.* (quoting *Treichler*, 775 F.3d at 1101).  "In evaluating this issue, [the Court] consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules."  *Treichler*, 775 F3d at 1104–05.  "Where . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency."  *Id.* at

---

[9] The Court cannot say definitively that there are no jobs because these are just a few that were identified by the vocational expert as occupations Plaintiff could do subject to the RFC identified by the ALJ. However, the vocational expert did testify that he would not be able to perform the identified occupations being off task 15 minutes every hour or missing work twice a month.  (ECF No. 13-2 at 116–17.)

1105.  When, as here, the ALJ's findings regarding the claimant's subjective symptom testimony are inadequate, remand for further findings on credibility is appropriate.  *See Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995).

As discussed above, the ALJ failed to properly evaluate Plaintiff's subjective complaints.  The ALJ's findings regarding Plaintiff's subjective symptom testimony are inadequate and further administrative review may remedy the ALJ's errors, making remand appropriate in this case.  *See Ghanim*, 763 F.3d at 1166; *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011); *Byrnes*, 60 F.3d at 642.  The Court is not going to create reasons that the ALJ did not give or support in his findings, however, the Court does find that further administrative proceedings are necessary to allow the ALJ to do this evaluation under these circumstances.  The Court finds that remand is proper in this case, since not all factual issues have been resolved and it is not clear whether the Plaintiff is entitled to benefits under the applicable legal rules.  *See Treichler*, 775 F3d at 1104–05.

### D. The Court Declines to Address Plaintiff's Remaining Argument

Having found that remand is warranted, the Court declines to address Plaintiff's remaining argument as to whether the ALJ properly accounted for all of Plaintiff's limitations listed in Dr. Thibodeau's opinion.  *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Kershner v. Saul*, No. 2:18-CV-0717-DB, 2020 WL 5366520, at *4 n.5 (E.D. Cal. Sept. 2020) ("Given the ALJ's error, that correction of the error may alter the entirety of the ALJ's opinion, and in light of plaintiff's request that this matter be remanded for further proceedings, the court finds it unnecessary to reach plaintiff's remaining claims of error."); *Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments."); *Janovich v. Colvin*, No. 2:13-cv-0096-DAD, 2014 WL 4370673, at *7 (E.D. Cal. Sept. 2014) ("In light of the analysis and conclusions set forth above, the court need not address plaintiff's remaining claims of error.");

*Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

**VI.    CONCLUSION**

Based on the above reasoning, Plaintiff's Motion for Summary Judgment (ECF No. 17) is **GRANTED IN PART AND DENIED IN PART**, the Commissioner's Cross-Motion for Summary Judgment (ECF No. 20) is **GRANTED IN PART AND DENIED IN PART**, and the case is **REMANDED** for further proceedings.

**IT IS SO ORDERED.**

Dated:  February 17, 2021

Hon. Bernard G. Skomal
United States Magistrate Judge